# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER OF R-G PREMIER BANK OF PUERTO RICO | |
|    Plaintiff, | Civil No. |
|    v. | RE:  Breach of Fiduciary Duties, Gross Negligence, Damages<br>Plaintiff Demands Trial by Jury |
| VICTOR J. GALÁN-ALVAREZ, HIS SPOUSE NELIDA FUNDORA, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; RAMÓN PRATS, HIS SPOUSE TERESITA NOBLE-FERNÁNDEZ, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; ROLANDO RODRÍGUEZ-MANCEBO, HIS SPOUSE MARÍA VINA, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; VICTOR IRIZARRY-ORTIZ, HIS SPOUSE ADRIANA ROIG-LÓPEZ, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; JOSEPH L. ABRAHAMSON, HIS SPOUSE MARGARITA COLÓN, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; JUAN AGOSTO-ALICEA, HIS SPOUSE DAPHNE BOUET-GRANA, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; LUIS BERRIOS, HIS SPOUSE ROSA CAAMANO-LÓPEZ, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; LAUREANO CARUS, HIS SPOUSE NILDA GONZALEZ, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; ILEANA M. COLÓN-CARLO, HER SPOUSE JOSE GONZALEZ, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; BENIGNO R. FERNANDEZ-ROSARIO; HIS SPOUSE JACQUELINE MCNEE, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; MELBA FIGUEROA-PADILLA; VICTOR L. GALÁN- | |

1

FUNDORA, HIS SPOUSE MAGDALENA MARTINEZ, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; ROBERTO GORBEA-FRONTERA, HIS SPPOUSE NELLIE DIAZ-PABON, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; JAMES LYNN, HIS SPOUSE SYLVIA DIAZ-RODRIGUEZ, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; EDUARDO MCCORMACK, HIS SPOUSE MARINA VALENTIN, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; IVAN MENDEZ, HIS SPOUSE RAQUEL MIRO-CORDERO, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; RAFAEL NIN-TORREGROSA, HIS SPOUSE DORIS PRICE, AND THE CONJUGAL PARTNESHIP FORMED BETWEEN THEM; GILBERTO RIVERA-ARREAGA, HIS SPOUSE GRISEL FUENTES, AND THE CONJUGAL PARTNERSHIP FORMED BETWEEN THEM; ENRIQUE UMPIERRE-SUAREZ; AND XL SPECIALTY INSURANCE COMPANY

Defendants

## COMPLAINT AND DEMAND FOR JURY TRIAL

**TO THE HONORABLE COURT:**

**NOW COMES** Plaintiff, the Federal Deposit Insurance Corporation (the "FDIC"), in its capacity as receiver (the "FDIC-R") for R-G Premier Bank of Puerto Rico ("R-G Premier" or the "Bank"), through its undersigned counsel and respectfully states, alleges and prays:

## NATURE OF ACTION

1.     This is a civil action against nineteen former directors and officers of R-G Premier (the "Directors and Officers"), seventeen of their spouses (the "Spouses") and seventeen related conjugal partnerships (the "Conjugal Partnerships"), and their director and officer liability insurer (collectively "Defendants"). The FDIC plays a critical role in safeguarding the

stability of the nation's financial system.   Prior to 1933, when the directors and officers of a financial institution ran a bank into the ground, unprotected depositors generally discovered that the bank's failure meant that their deposits were lost. As a result, in 1933, the government established the FDIC to insure banks' depositors, so that bank customers would not lose their money if the bank failed. Along with the responsibility to step in to protect depositors, the FDIC was also charged with the power and duty to hold responsible any officers and directors whose conduct lead to the failure of the bank. Since the formation of the FDIC, no depositor has lost a single cent of insured funds.  R-G Premier's failure on April 30, 2010 was one of the largest bank failures in Puerto Rico's history, costing the Deposit Insurance Fund over $1.46 billion in losses.   Absent the FDIC's deposit insurance, when the Directors and Officers caused R-G Premier to fail, many citizens of Puerto Rico would have lost much of their hard-earned life savings.  The seeds of the Bank's collapse were planted over a decade earlier, when the Directors and Officers of a primarily residential mortgage bank decided to dramatically expand the Bank's commercial lending and hired a commercial loan officer, Victor Irizarry Ortiz ("Irizarry") to increase Bank lending.  Rather than supervising Irizarry, the Directors and Officers gave him virtually absolute control over the Bank's commercial lending.  For years, the Directors and Officers ignored numerous warnings from multiple sources about serious problems in the Bank's management, and freed Irizarry to recklessly pursue explosive commercial loan growth and to undermine proper underwriting and risk management.  Between November 2004 and December 2008 alone, the Bank extended over $350 million in loans that any prudent banker should have known would probably never be repaid.   The Directors and Officers also exacerbated and accelerated these losses by robotically approving virtually any loan request that crossed their desks, even though such loan requests had been processed through the obviously deficient

lending structure they had created at the Bank.  The FDIC-R seeks to recover damages in excess of $257 million for losses incurred by R-G Premier as a result of the breaches of fiduciary duties and gross negligence of the Directors and Officers in connection with 77 transactions as described more particularly below.

2.      The claims against the Directors and Officers are based on (1) their grossly negligent failure to exercise due care and any business judgment in approving obviously risky and deficiently underwritten loans; and (2) their grossly negligent failure to inform themselves about and to exercise adequate oversight over the Bank's lending function after February 22, 2006.  The claims against the Spouses and Conjugal Partnerships are based on their legal relationship to the Directors and Officers.  By ignoring the obvious risks of injury to the Bank from specific loans which they knew or should have known were extremely unlikely to be paid back, and also the equally clear risks of injury to the Bank from the Bank's inappropriate lending structure, the Directors and Officers breached their fiduciary duties of care to the Bank.

3.      The claims against XL Specialty Insurance Company ("XL") are based on director and officer liability insurance policy numbers ELU108674-08 and ELU108668-08 (the "Policies").  The Policies were issued by XL to R&G Financial Corporation ("RGFC" or the "Holding Company"), the holding company for R-G Premier, and its subsidiaries, and cover claims first made under the Policies against the Defendants between November 30, 2009, and December 30, 2010, for gross negligence and/or breach of fiduciary duties.

## PARTIES

### Plaintiff

4.      The FDIC is a corporation organized and existing under the laws of the United States of America.  12 U.S.C. § 1811, *et. seq.*  The FDIC is an instrumentality of the United

States of America and is charged with, among other duties, the orderly liquidation of failed banks.  12 U.S.C. § 1821(d).  R-G Premier was a nonmember bank chartered under the laws of Puerto Rico, and its deposits were insured by the FDIC.  On or about April 30, 2010, the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico ("OCFI") closed R-G Premier and the FDIC-R was named receiver.   Pursuant to 12 U.S.C. § 1821(d)(2)(A)(I), the FDIC-R succeeded to all rights, titles, powers, and privileges of R-G Premier and R-G Premier's shareholders with respect to R-G Premier, including, but not limited to, R-G Premier's claims against the Directors and Officers for gross negligence and breaches of fiduciary duties or other legal duties.

<u>The Directors and Officers</u>

5.      Victor J. Galán-Alvarez ("Galán") founded R-G Premier in 1990.  Beginning in February 1990, Galán was Chief Executive Officer ("CEO"), President, and Chairman of the Board of R-G Premier.  He was President until January 29, 2001, CEO until January 1, 2007, and Chairman until June 30, 2007.   He remained a director of R-G Premier and controlling shareholder of RGFC until the Bank failed.  He also acted as a member of the Bank's Directors' Loan Committee.  Galán is married to Nelida Fundora, with whom he has a conjugal partnership.  Upon information and belief, they reside in Guaynabo, Puerto Rico.

6.      Ramón Prats ("Prats") was Vice Chairman of the Board of R-G Premier from 1990 to January 5, 2006, an Executive Vice President from 1996 to January 30, 2001, and President of the Bank from January 30, 2001, to January 5, 2006.  He also acted as a member of the Bank's Directors' Loan Committee. Prats is married to Teresita Noble Fernández with whom he has a conjugal partnership. Upon information and belief, they reside in Rio Piedras, Puerto Rico.

7.      Rolando Rodríguez-Mancebo ("Rodríguez") was a director of R-G Premier from December 27, 2006, and CEO from January 1, 2007, until the Bank failed.  He was also a member of the Directors' Loan Committee from January 31, 2008, to January 14, 2010. Rodríguez is married to María Vina, with whom he has a conjugal partnership. Upon information and belief, they reside in San Juan, Puerto Rico.

8.      Victor Irizarry Ortiz ("Irizarry") was R-G Premier's Senior Vice President of Corporate Banking from May 31, 1999, to January 5, 2006, and Executive Vice President of Corporate Banking from January 5, 2006, until he was terminated effective December 5, 2008. He was also Chief Lending Officer from January 2001 to December 5, 2008.  He was a member of the Bank's Joint Loan Committee from March 16 to August 10, 2006, a member of the Management Loan Committee from August 10, 2006, to December 5, 2008, and a member of the Director's Loan Committee from May 27, 2003, to December 5, 2008.  Irizarry is married to Adriana Roig López, with whom he has a conjugal partnership. Upon information and belief, they reside in Gurabo, Puerto Rico.

9.      Joseph L. Abrahamson ("Abrahamson") was R-G Premier's Vice President of Credit Risk Management for the Bank from 2002 to March 2006 and Senior Vice President of Credit Risk Management from March 2006 until he resigned from the Bank on December 5, 2008.  He was a member of the Bank's Joint Loan Committee from March 16 to August 10, 2006, a member of the Management Loan Committee from August 10, 2006, to December 5, 2008, and a member of the Director's Loan Committee from May 27, 2003, to January 29, 2008. Abrahamson is married to Margarita Colón, with whom he has a conjugal partnership. Upon information and belief, they reside in Gurabo, Puerto Rico.

10.     Juan Agosto Alicea ("Agosto") was Vice Chairman of the Board of R-G Premier from February 15, 2007, to July 1, 2007, and Chairman of the Board from July 1, 2007, until the Bank failed.   Agosto is married to Daphne Bouet Grana, with whom he has a conjugal partnership.  Upon information and belief, they reside in San Juan, Puerto Rico.

11.     Luis Berrios ("Berrios") was an advisory director of R-G Premier from 2003 to 2006.  He was a member of the Bank's Joint Loan Committee from March 16 to August 10, 2006, and a member of the Directors' Loan Committee from May 27, 2003 to March 7, 2006. Berrios is married to Rosa Caamano López, with whom he has a conjugal partnership. Upon information and belief, they reside in Canovanas, Puerto Rico.

12.     Laureano Carus ("Carus") was a director of R-G Premier from 1990 to March 27, 2007.   Carus is married to Nilda Gonzalez, with whom he has a conjugal partnership. Upon information and belief, they reside in Guaynabo, Puerto Rico.

13.     Ileana M. Colón-Carlo ("Colón-Carlo") was a director of R-G Premier from May 31, 2000 until the Bank failed. Colón-Carlo is married to Jose Gonzalez, with whom she has a conjugal partnership. Upon information and belief they reside in San Juan, Puerto Rico.

14.     Benigno R. Fernandez-Rosario ("Fernandez") was a director of R-G Premier from June 1996 until the Bank failed.  Fernandez is married to Jacqueline McNee, with whom he has a conjugal partnership. Upon information and belief, they reside in San Juan, Puerto Rico.

15.     Melba Figueroa-Padilla ("Figueroa") was a director of R-G Premier from May 27, 2004 until the Bank failed.  Upon information and belief, Figueroa resides in San Juan, Puerto Rico.

16.     Victor L. Galán-Fundora ("Galán Jr.") was a director of R-G Premier from 1995 to December 15, 2009.  Galán Jr. is married to Magdalena Martinez, with whom he has a conjugal partnership. Upon information and belief, they reside in Guaynabo, Puerto Rico.

17.     Roberto Gorbea-Frontera ("Gorbea") was a director of R-G Premier from May 31, 2000, to April 30, 2010.  He was a member of the Bank's Directors' Loan Committee from January 31, 2006 until the Bank failed.  Gorbea is married to Nellie Diaz-Pabon, with whom he has a conjugal partnership. Upon information and belief, they reside in San Juan, Puerto Rico.

18.     James Lynn ("Lynn") was an advisory director of R-G Premier from 2003 to 2006.  He was a member of the Bank's Joint Loan Committee from March 16 to August 10, 2006, and a member of the Directors' Loan Committee from May 27, 2003 to March 7, 2006. Lynn is married to Sylvia Diaz Rodriguez, with whom he has a conjugal partnership.  Upon information and belief, they reside in San Juan, Puerto Rico.

19.     Eduardo McCormack ("McCormack") was a director of R-G Premier from 1990 to December 15, 2009.  McCormack is married to Marina Valentin, with whom he has a conjugal partnership. Upon information and belief, they reside in Guaynabo, Puerto Rico.

20.     Ivan Mendez ("Mendez") was a director of R-G Premier from February 23, 2004, to May 31, 2006.  Mendez is married to Raquel Miro Cordero, with whom he has a conjugal partnership. Upon information and belief, they reside in San Juan, Puerto Rico.

21.     Rafael Nin-Torregrosa ("Nin") was a director of R-G Premier from July 31, 2003 until the Bank failed.  He was a member of the Bank's Joint Loan Committee from March 16, 2006, to August 10, 2006, and a member of the Directors' Loan Committee from August 27, 2003 until the Bank failed.  Nin is married to Doris Price, with whom he has a conjugal partnership. Upon information and belief, they reside in San Juan, Puerto Rico.

22.     Gilberto Rivera-Arreaga ("Rivera-Arreaga") was a director of R-G Premier from June 1996 to December 31, 2008.  He was a member of the Directors' Loan Committee from March 17, 2006, to December 31, 2008.  Rivera-Arreaga is married to Grisel Fuentes, with whom he has a conjugal partnership. Upon information and belief, they reside in Dorado, Puerto Rico.

23.     Enrique Umpierre-Suarez ("Umpierre") was a director of R-G Premier from January 1996 to December 15, 2009, and Secretary of the Board from April 1996 to December 15, 2009.  Upon information and belief, Umpierre resides in Miami, Florida.

The Insurance Company

24.     XL is a foreign corporation duly registered and authorized to do business in the Commonwealth of Puerto Rico by all pertinent governmental authorities. Upon information and belief, XL is organized and existing under the laws of Delaware, whose principal place of business is in Wilmington, Delaware.  XL is an insurance company that issued the Policies to RGFC to cover the damages alleged herein.  These policies were in full force and effect at the time the FDIC-R first made its claims against the Directors and Officers.

**JURISDICTION AND VENUE**

25.     This Court has subject matter jurisdiction over this matter, as actions in which the FDIC-R is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, *et. seq.*; 12 U.S.C. § 1819(b)(1) and (2); and 28 U.S.C. § 1331 and 1345.  The FDIC-R has the power to sue and complain in any court of law.  12 U.S.C. § 1819.

26.     This Court has personal jurisdiction over all of the Directors and Officers, the Spouses, and the Conjugal Partnerships, who at all relevant times were residents of, and conducted the business of R-G Premier in, Puerto Rico.

27. This Court has personal jurisdiction over XL because it conducts business in Puerto Rico.

28. Venue is proper in this District under 28 U.S.C. § 1319(b), as all or substantially all of the events and/or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND

### I. Galán Founds R-G Premier

29. In February 1990, Galán, founder of R&G Mortgage, purchased a small and nearly defunct bank and renamed it R&G Federal Savings Bank.  In November 1994, he changed the bank's name to R-G Premier Bank and converted it to a Puerto Rico charter.  In March 1996, Galán formed RGFC as the holding company for R&G Mortgage and R-G Premier.

30. R-G Premier enjoyed great initial success as a mortgage bank.  However, Galán eventually decided to expand R-G Premier into commercial lending.  In order to do so, on May 31, 1999, he hired Irizarry as a lending officer.

### II. The Board Turns Irizarry Loose

31. In January 2001, the Board of Directors appointed Irizarry as the Chief Lending Officer of R-G Premier, and gave him a mandate to increase commercial real estate lending.  The Board structured the Bank to give Irizarry free rein to make commercial real estate loans without instituting any effective checks to protect the safety and soundness of the Bank.  Between 2001 and 2008, Irizarry enjoyed nearly absolute control over the Bank's commercial lending.  So complete was his authority that one Bank employee described Irizarry's authority as on par with that of Prats, the Bank's President.

32.     Perhaps the most glaring deficiency in the Bank's structure was the fact that the Board gave Irizarry, the Chief Lending Officer, control over the Bank's Credit Risk Management Department.  The Board made Abrahamson, the Senior Vice President and head of Credit Risk, Irizarry's direct subordinate.  Under this structure, all credit risk personnel ultimately answered to the Bank's chief loan producer, and could not effectively voice concerns about the underwriting of loans or creditworthiness of borrowers.

33.     The Board made Irizarry's control even more complete by failing to institute formal performance evaluations for its employees.  As a result, the careers of credit risk personnel rose and fell based on Irizarry's completely subjective goodwill.  Credit risk analysts at R-G Premier were worried that they would not advance and/or maintain their careers if they conducted rigorous and legitimate underwriting on proposed loans that Irizarry wanted approved.

34.     Irizarry deployed his authority with a heavy hand, and did not refrain from overtly pressuring credit risk personnel.  On at least one occasion, when a credit risk analyst objected to a loan he wanted approved, he explicitly threatened her job.  "If you can't do this," he said, "I will find someone else who can."

35.     The Board was warned time and again that its refusal to segregate loan production from credit risk management posed significant risk to the Bank.  An internal audit of the Bank's Corporate Banking Loans Department, conducted as of August 31, 2003, noted that the Credit Risk Management and Loan Administration Departments reported to the Chief Lending Officer. The audit recommended that the Board separate these areas and make them independent of loan production.  The Board ignored this recommendation.

36.     Another internal audit was conducted the next year, as of September 30, 2004, and made the same recommendation.  An even later audit, conducted as of July 31, 2006, noted

the same deficiency in the Bank's lending structure and again recommended that the Board separate loan production and credit risk.  The Board continued to ignore these concerns.

37.     In short, the Board literally subordinated sound credit risk management and the safety of the Bank to increasing loan production at all costs.  The Board preserved this risky and deficient structure until January 29, 2008, when it finally permitted Jose Diaz ("Diaz"), who replaced  Prats as the Bank's President in March 2006, to strip Irizarry of his authority over the Credit Risk Management Department.

## III.     The Board Turns A Blind Eye to the Bank's Lending

38.     Having instituted an obviously unsafe lending structure, the Board also failed to adequately oversee the Bank's lending.  In particular, the Board failed to institute effective loan reviews, critically undermining its own ability to monitor the health and quality of its rapidly expanding commercial loan portfolio.

39.     Until at least March 2007, the Bank's Loan Review Department failed to record and monitor the status of outstanding loans in computer systems.  Significantly, the "Risk Rating" field in the Bank's computer loan system was blank.  Instead, the Loan Review department kept only handwritten reports, a cumbersome system that made it much more difficult to actively monitor individual loans or the Bank's loan portfolio as a whole.

40.     Until at least March 2007, the Bank also failed utterly to track how many of its loans were granted pursuant to an exception to the Bank's loan policy.  Instead, as noted in the 2007 Joint FDIC/OCFI Report of Examination ("RoE"), delivered to the Bank on August 26, 2008, "management approved many policy exceptions on a loan-by-loan basis with no mechanism to track the aggregate level or materiality."  For example, Bank policy prohibited more than three extensions for one loan.  However, extensions were granted whenever a Bank

officer simply filled out an extension form.  Although the extension forms provided a field for listing the number of times the subject credit had previously been extended, this field was frequently left blank.  Consequently, extensions were often granted in violation of Bank policy, without that violation being documented, or even recognized, by the Bank.

41.    The Loan Review Department submitted monthly reports to the Board's Audit Committee.  However, until at least March 2007, these "reports" were an empty formality. Rather than summarizing and analyzing loan review data in a useful manner, these reports simply stated how many loans had been reviewed that month, and attached the individual loan review sheets.  Having received these reports, the Board was - or should have been - well aware that the Bank's loan review function was ineffective, but the Board never moved proactively to strengthen that function or address its obvious inadequacies.

42.    The Loan Review Department finally began producing useful reports towards the end of 2007, after the head of the department left the Bank and was replaced by Johana Quiñones, who attempted to improve the Bank's inadequate reporting on her own initiative.

**IV.    The Board Ignores Warnings from Regulators**

43.    The FDIC, FRB, and OCFI conducted regular examinations of the safety and soundness of the Bank.  They documented these examinations in RoEs, which assigned the Bank a rating between 1 and  5 on each of six factors: Capital, Asset Quality, Management, Earnings, Liquidity, and Sensitivity to Market Risk.  A score of 1 is the best possible rating, while a score of 5 is the worst. The RoEs also give the Bank a general composite score based on the same scale.

44.    On September 12, 2005, regulators from the FDIC and OCFI began an annual examination of the Bank for the year 2005.  Earlier that year, on April 25, 2005, RGFC had

announced that it would restate its earnings for 2003 and 2004 because the Bank (and consequently, the Holding Company) had improperly accounted for future interest income from certain mortgage loan pools as present income, and thereby artificially and inaccurately inflated the Bank's reported profits.  RGFC later also announced that it would restate its earnings for 2002 as well.  The problems associated with this accounting issue raised significant doubts in regulators about the ability and willingness of the Bank's Board and senior management to properly oversee the Bank.  Therefore, on February 22, 2006, the FDIC and OCFI issued an interim ratings change that downgraded the Bank to a composite 3, and, significantly, also specifically rated the Bank's management as a 3.

45.     On March 16, 2006, the FDIC issued a Cease and Desist Order ("C&D") to R-G Premier requiring the Board to report on progress in revising the Bank's general "policies, procedures, plans, and programs" and to hire a consulting firm to advise the Bank on management structure, risk management, and corporate governance issues.

46.     In the final RoE for 2005, which was delivered to the Board by August 22, 2006, the Bank's management retained its low 3 rating.  The examiners noted in this RoE that the Board had "liberal loss mitigation practices for severely past-due loans" and warned that "management must ensure that refinancing of its past due loans serviced by the affiliated R&G Mortgage is in accordance with bank approved underwriting criteria."

47.     On June 26, 2007, regulators delivered to the Board the 2006 RoE.  This RoE again rated the Bank's management as a 3.  This report noted that management had admitted to regulators that it was still struggling to complete the restatement announced by RGFC in 2005, and that these efforts "sometimes impaired [management's] ability to deal with [other lending] issues as they should."   Despite this, regulators stressed that "adequate supervision of all

management areas should be provided," noting that the Board "has not approved all policies annually" even though "[p]roper oversight and control dictates that all lending policies be approved by the bank's Board of Directors at least annually."

48.     On August 26, 2008, regulators delivered to the Board the 2007 RoE.  Again the Bank's management was rated as a 3, and the Bank's composite score was also downgraded to a 3.  Examiners noted that "the Loan Department structure did not previously provide for separation of duties in such areas such as appraisal order and review procedures or credit risk analysis."  They also observed that "management approved many policy exceptions on a loan-by-loan basis with no mechanism to track the aggregate level or materiality" and that loan underwriting and administration had been inconsistent throughout the Bank.

49.     By September 2, 2009, when regulators delivered to the Board the 2008 RoE, the impact of poor Board and management oversight lay fully exposed.  This RoE assigned the Bank a composite rating of 4, including a 4 for management.  This RoE noted that most of the Bank's classified loans had been "approved under weak and liberal underwriting standards," including "liberal lending practices on construction and land development loans."  Identified weaknesses included "liberal risk limits; absence of loan officer memoranda; interest reserves not tracked; deficient construction status reports; lack of global cash-flow analysis; and soft cost proceeds used for interest payments."

50.     In short, beginning February 22, 2006, regulators repeatedly and continuously warned the Bank's Board and senior management that they were not exercising proper oversight over the Bank, and that internal controls at the Bank were woefully deficient.

## V.      The Board Resists Reform

51.     Under pressure from and criticisms by regulators, the Bank finally made significant changes to the composition of its Board and senior management in 2006 and 2007. On March 20, 2006, Diaz replaced Prats as Bank President.  Additionally, on January 1, 2007, Rodríguez replaced Galán as CEO, and, on July 1, 2007, Agosto replaced Galán as Chairman of the Board.

52.     Significantly, these personnel changes did little to improve the Bank's inadequate management and deficient internal controls.  As discussed above, regulatory examinations continued to yield a constant string of low management ratings.  Rodríguez and Agosto left the Bank's obviously deficient lending structure undisturbed, and the Board resisted and frustrated all attempts at reform by the Bank's new President, Diaz.

53.     For example, Diaz became President in March 2006, but the Board refused for fifteen months to have Irizarry report directly to Diaz before finally agreeing to the change in June 2007.  Even worse, it was not until six months after that, on January 29, 2008, that the Board finally permitted Diaz to strip Irizarry of his authority over the Bank's Credit Risk Management Department.

54.     The Board also sided with Irizarry over Diaz with respect to specific loans.  For example, on one occasion, the Bank's Directors' Loan Committee was considering a loan to Francisco Pujols.  President Diaz opposed the loan, expressing substantial concerns about the loan's prospects for repayment, but Irizarry strongly favored it.  Ignoring Diaz's concerns, the Committee approved the loan, subject only to some modifications to its terms.

55.     In other words, even after essentially being forced by regulators to change the Bank's management, the Bank's Board ignored calls by the Bank's new President for necessary

reforms.  The Board pretended to institute changes demanded by regulators by replacing the President, CEO, and Chairman of the Board for the Bank, but actually obstructed reform. Instead of taking regulatory concerns seriously, the Board preserved the reckless Chief Lending Officer's dangerous control over the Bank's Credit Risk Management Department, undermined the new President's authority and oversight over that officer, and even sided with that officer over the President on specific loans.

## VI.   The Directors and Officers Personally Approve Obviously Risky Loans

56.    In between November 24, 2004, and December 24, 2008, each of the Directors and Officers, except for Agosto, personally approved at least some of the following obviously risky loans.  The following 60 loans caused significant loss to the Bank, and were approved by the Defendants herein in blatant violation of the duties owed by them to the Bank.

### A.    Maxim Tower Corporation - November 23, 2004

57.    On or around November 23, 2004, Defendants Irizarry, Abrahamson, Lynn, Berrios, Nin, Galán, and Prats approved, as members of the Directors' Loan Committee, a $12,372,310 loan to R.J. Development, S.E.  On May 17, 2005, the borrower name was changed to Maxim Tower Corporation.  On December 16, 2004, Defendants Nin, Irizarry, Abrahamson, Lynn, and Berrios approved, as members of the Directors' Loan Committee, a $180,000 increase in this loan for a new total of $12,552,310.  On November 21, 2006, Defendants Nin, Rivera-Arreagea, Gorbea, Irizarry, and Abrahamson approved, as members of the Directors' Loan Committee, a $1,025,000 increase in this loan for a new total of $13,577,310.

58.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.  The Bank did not obtain three fiscal year-end financial statements for the borrower, as required by Bank policy; and

b.  The financial statements submitted by the borrower demonstrated that the borrower had insufficient liquidity to service the debt; and

c.  The Bank did not adequately analyze the increased risk created by the borrower's affiliation with another borrower of the Bank; and

d.  The borrower's equity in the project was 12.6%, below the 15% minimum required by the Bank's policy.

59.  The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $9.78 million.  Such loss was proximately caused by the conduct alleged herein.

B.   Por Mag Real Estate, S.E. - December 14, 2004

60.  On or around December 14, 2004, Defendants Irizarry, Abrahamson, Lynn, Berrios, Nin, Galán, and Prats approved, as members of the Directors' Loan Committee, a $3,000,000 loan to Por Mag Real Estate, S.E.

61.  This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.  The borrower's financial statements indicated a net income loss of nearly $500,000 for 2004; and

b.  The borrower's financial statements indicated a negative net worth of nearly $800,000 at the end of 2004; and

c.  With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities would exceed $25 million.

62.     The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $2.22 million.  Such loss was proximately caused by the conduct alleged herein.

C.     Boquerón Resort, S.E. - December 29, 2004

63.     On or around December 29, 2004, Defendants Irizarry, Abrahamson, Berrios, Nin and Galán approved, as members of the Directors' Loan Committee, a $4,500,000 loan to Boquerón Resort, S.E.  On August 31, 2006, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga and Gorbea approved, as members of the Directors' Loan Committee, a $10,500,000 million increase in this loan for a new total of $15,000,000.

64.     This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.  The borrower failed to satisfy the condition precedent requiring a Phase I Environmental Study stating no environmental hazard exists; and

b.  With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities would exceed $69 million; and

c.  Repayment of the loan depended primarily upon the sale of time-share intervals in vacation units and was therefore vulnerable to the cyclical and seasonal tourism industry.

65.     The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $10.59 million.  Such loss was proximately caused by the conduct alleged herein.

D.     Real Anon, Inc. - March 15, 2005

66.     On or around March 15, 2005, Defendants Irizarry, Abrahamson, Lynn, Berrios, and Nin approved, as members of the Directors' Loan Committee, a $5,700,000 loan to Real Anon, Inc.

67.     This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.   The appraisal of the collateral property was not addressed to the Bank; and

b.   The appraised value of the collateral property was based on the hypothetical approval of a zoning change; and

c.   A portion of the collateral property had been occupied by a squatter community known as "La Trocha" for over 30 years; and

d.   Even based on the speculative appraisal, the loan-to-cost ratio was 97% and the loan-to-value ratio was 81%, both of which exceeded the Bank's policy maximums; and

e.   The borrower, a newly formed corporation, had no financial statements; and

f.   The Bank did not update the guarantor's personal financial statements.

68.     The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $6.01 million.  Such loss was proximately caused by the conduct alleged herein.

E.     Venetian Investment Group, Inc. - March 22, 2005

69.     On or around March 22, 2005, Defendants Irizarry, Abrahamson, Lynn, and Berrios approved, as members of the Directors' Loan Committee, a $9,370,000 loan to Venetian Investment Group, Inc.  On or around December 11, 2007, Defendants Irizarry, Abrahamson,

Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $3,516,000 increase in this loan for a new total of $12,886,000.  On or around August 18, 2009, Defendants Nin and Rivera-Arreaga approved, as members of the Directors' Loan Committee, a $1,877,000 increase in this loan for a new total of $14,763,000.

70.     This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

> a.  The financial statements of the guarantor showed no capacity to repay the loan without sale of the subject property; and
>
> b.  The subject property for this loan was high-end residential apartments vulnerable to risks from the cyclical nature of the real estate industry; and
>
> c.  The borrower failed to satisfy the loan condition requiring a Payment & Performance Bond for the entire construction contract; and
>
> d.  With the first approval of this loan, the Bank's aggregate exposure to the borrower and related entities exceeded $10 million.

71.     The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $10.84 million.  Such loss was proximately caused by the conduct alleged herein.

F.      Jalexis, Inc. - March 31, 2005

72.     On or around March 31, 2005, Defendants Irizarry, Abrahamson, Lynn, Berrios, Nin, Prats, Rivera-Arreaga, Gorbea, Colón-Carlo, Mendez, Figueroa, Fernandez, and Galán Jr. approved, as members of the Directors' Loan Committee and/or Board of Directors, a $27,000,000 loan to Jalexis, Inc.  On or around December 8, 2005, Defendants Irizarry, Abrahamson, Lynn, Berrios, and Nin approved, as members of the Directors' Loan Committee, a

$5,800,000 increase in this loan for a new total of $32,800,000.  On or around March 8, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $4,700,000 increase in this loan for a new total of $37,500,000.  On or around May 15, 2007, Defendants Irizarry, Abrahamson, Nin, and Gorbea approved, as members of the Directors' Loan Committee, a temporary $935,460 increase in this loan for a temporary new total of $38,435,460.  On or around July 10, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $2,000,000 increase in this loan for a new total of $39,500,000.

73.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

    a.   The Bank did not obtain or review current financial statements for the borrower and guarantor; and

    b.   The Bank did not adequately analyze the financial statements that were submitted for, *inter alia*, cash flow, liquidity ratios, or contingent liabilities; and

    c.   With the first approval of this loan, the Bank's aggregate exposure to the borrower and related entities already exceeded $39 million.

74.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $23.23 million.  Such loss was proximately caused by the conduct alleged herein.

G.    Dorado Condominium, S.E. - May 23, 2005

75.    On or around May 23, 2005, Defendants Irizarry, Abrahamson, Lynn, Berrios, Nin, Galán, and Prats approved, as members of the Directors' Loan Committee, a $326,854.30 loan to Dorado Condominium, S.E.

76.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.    The Bank did not obtain a current appraisal of the collateral for this loan, despite the fact that the local real estate market was already in decline; and

b.    With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities exceeded $54 million.

77.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $244,000.  Such loss was proximately caused by the conduct alleged herein.

H.    Ernesto Acosta Rodríguez - May 31, 2005

78.    On or around May 31, 2005, Defendants Irizarry, Abrahamson, Lynn, Berrios, and Nin approved, as members of the Directors' Loan Committee, a $300,000 loan to Ernesto Acosta Rodríguez.

79.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.    Repayment was dependent upon real estate collateral in a declining real estate market; and

b.    With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities exceeded $10 million; and

c.   The borrower had failed to timely repay advances on another loan.

80.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $129,000.  Such loss was proximately caused by the conduct alleged herein.

I.   Xuapa II, Inc. - June 14, 2005

81.   On or around June 14, 2005, Defendants Irizarry, Abrahamson, Lynn, Berrios, and Nin approved, as members of the Directors' Loan Committee, a $5,000,000 loan to Xuapa II, Inc.  On or around September 5, 2006, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $5,000,000 increase in this loan for a new total of $10,000,000.

82.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.   The Bank failed to analyze the capacity of the borrower and guarantors to service the debt without sale of the collateral property; and

b.   The borrower's financial statements showed income losses and negative net worth; and

c.   With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities exceeded $59 million.

83.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $7.85 million.  Such loss was proximately caused by the conduct alleged herein.

J.      Las Americas 74-75, Inc. - July 28, 2005

84.     On or around July 28, 2005, Defendants Irizarry, Abrahamson, Lynn, Berrios, Nin, Galán, Prats, Rivera-Arreaga, Gorbea, Colón-Carlo, Mendez, Fernandez, Umpierre, and Galán Jr. approved, as members of the Directors' Loan Committee and/or Board of Directors, a $13,900,000 loan to Las Americas 74-75, Inc.

85.     This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

    a.  The Bank failed to stress test the borrower's sources of income for possible adverse economic conditions; and

    b.  The loan-to-cost ratio for this loan was 100%, in violation of the Bank's policy maximum; and

    c.  The Bank relied on an appraisal by an appraiser not on the Bank's approved list, in violation of the Bank's policy; and

    d.  The loan was to be amortized over 25 years, in violation of the Bank's policy.

86.     The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $2.46 million.  Such loss was proximately caused by the conduct alleged herein.

K.      Por Mag Real Estate, S.E. - October 28, 2005

87.     On or around October 28, 2005, Defendants Irizarry, Abrahamson, Lynn, Berrios, Nin, Galán, Prats, Rivera-Arreaga, Gorbea, Colón-Carlo, Mendez, Figueroa, Fernandez, Umpierre, Galán Jr., Carus, and McCormack approved, as members of the Directors' Loan Committee and/or Board of Directors, a $1,100,000 loan to Por Mag Real Estate, S.E.

88.     This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

  a.   The loan-to-cost ratio for this loan was 98%, in violation of the Bank's policy maximum; and

  b.   The Bank relied on an appraisal ordered by and addressed to the borrower instead of the Bank; and

  c.   The Bank failed to verify, document, or analyze the costs that this loan was intended to finance; and

  d.   The borrower's financial statements showed net income loss for the previous year of nearly $500,000; and

  e.   The borrower's financial statements showed negative net worth of nearly $800,000.

89.     The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $934,000.  Such loss was proximately caused by the conduct alleged herein.

  L.     Lotesiete, Inc. - October 28, 2005

90.     On or around October 28, 2005, Defendants Irizarry, Abrahamson, Berrios, Nin, Galán, Prats, Rivera-Arreaga, Gorbea, Colón-Carlo, Mendez, Figueroa, Fernandez, Umpierre, Galán Jr., Carus, and McCormack approved, as members of the Directors' Loan Committee and/or Board of Directors, a $2,500,000 loan to Lotesiete, Inc.

91.     This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

      a.   The Bank failed to stress test the capacity of the borrower and guarantors to repay the debt in a market downturn, despite the fact that the local real estate market was already in decline; and

      b.   The Bank failed to analyze the contingent liabilities of the borrower or guarantors; and

      c.   With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities exceeded $52 million.

92.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $2.18 million.  Such loss was proximately caused by the conduct alleged herein.

M.    <u>Quantum Development Corporation - December 1, 2005</u>

93.    On or around December 1, 2005, Defendants Irizarry, Abrahamson, Lynn, Nin, Galán, Prats, Rivera-Arreaga, Gorbea, Colón-Carlo, Mendez, Figueroa, Fernandez, Umpierre, Galán Jr., Carus, and McCormack approved, as members of the Directors' Loan Committee and/or Board of Directors, a $6,500,000 loan to Quantum Development Corporation.  On or around June 27, 2006, Defendants Irizarry, Abrahamson, Lynn, and Nin approved, as members of the Directors' Loan Committee, a $400,000 increase in this loan for a new total of $6,900,000. On or around April 26, 2007, Defendants Irizarry and Abrahamson approved, as officers, a $350,000 increase in this loan for a new total of $7,250,000.

94.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

    a.   The financial statements of the borrower and guarantors showed no capacity to repay the debt without sale of the collateral property in a declining real estate market; and

    b.   The loan-to-cost ratio for this loan was 100%, in excess of the Bank's policy maximum; and

    c.   With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities exceeded $32 million.

95.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $6.45 million.  Such loss was proximately caused by the conduct alleged herein.

N.    <u>Inmobiliaria El Capa, Inc. - December 21, 2005</u>

96.    On or around December 21, 2005, Defendants Irizarry, Abrahamson, Lynn, Berrios, and Nin approved, as members of the Directors' Loan Committee, a $742,500 loan to Inmobiliaria El Capa, Inc.

97.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

    a.   The loan-to-cost ratio for this loan was 90%, in violation of the Bank's policy maximum; and

    b.   The Bank failed to obtain current financial statements for the borrower or guarantor; and

    c.   With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities exceeded $12 million.

98.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $319,000.  Such loss was proximately caused by the conduct alleged herein.

O.   <u>Dorado del Mar Golf Condos, S.E. - January 25, 2006</u>

99.   On or around January 25, 2006, Defendants Irizarry, Abrahamson, Lynn, Berrios, Nin, and Galán approved, as members of the Directors' Loan Committee, a $4,360,000 loan to Dorado del Mar Golf Condos, S.E.  On or around June 20, 2006, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $590,000 increase in this loan for a new total of $4,950,000.  On or around July 3, 2007, Defendants Irizarry, Abrahamson, Nin, and Gorbea approved, as members of the Directors' Loan Committee, a $675,000 increase in this loan for a new total of $5,625,000.

100.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.   The borrower failed to satisfy a condition precedent requiring approval of the project to be financed by the Puerto Rico government; and

b.   The Bank relied on a summary appraisal report and failed to obtain a complete appraisal of the collateral property; and

c.   With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $50 million; and

d.   By the time of the last increase of this loan, the guarantor's credit score was below the Bank's policy minimum.

101.     The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $4.63 million.  Such loss was proximately caused by the conduct alleged herein.

P.     Emerald Princess, Inc. - February 8, 2006

102.     On or around February 8, 2006, Defendants Irizarry and Abrahamson approved, as officers, a $5,000,000 loan to Emerald Princess, Inc.

103.     This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.     The primary source of repayment for the loan was to be a later construction loan, but there was no certainty that such a loan could be obtained; and

b.     The Bank did not analyze the proposed construction project to determine if a later construction loan would be sufficient to repay this loan; and

c.     The Bank did not obtain complete financial statements for the guarantors prior to approval.

104.     The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $4.31 million.  Such loss was proximately caused by the conduct alleged herein.

Q.     R.J. Development Corporation - April 25, 2006

105.     On or around April 25, 2006, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $20,000,000 loan to R.J. Development, S.E.  On or around July 28, 2008, Defendants Irizarry, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $1,500,000 increase in this loan for a new total of $21,500,000.

106.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

  a.   The repayment of this loan was highly speculative and reliant on the sale of property that was to be developed; and

  b.   The loan-to-cost ratio for this loan was 88%, in violation of the Bank's policy maximum; and

  c.   The borrower's equity in the project was only 13%, below the Bank's policy minimum of 15%.

107.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $16.84 million.  Such loss was proximately caused by the conduct alleged herein.

R.   Vista Señorial, Inc. - April 27, 2006

108.   On or around April 27, 2006, Defendant Irizarry approved, as an officer, a $2,250,000 loan to Vista Señorial, Inc.  On or around August 23, 2006, Defendant Abrahamson post-approved, as an officer, the same loan.

109.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

  a.   One of the guarantors of the loan had a credit score of 593, below the Bank's policy minimum of 600; and

  b.   The repayment of this loan was dependent upon the borrower obtaining certain permits, but the Bank did not investigate or analyze the likelihood of or likely timeline for obtaining them;

       c.   The Bank relied upon self-prepared, unaudited, and unverified financial statements from the borrower.

110.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $1.91 million.  Such loss was proximately caused by the conduct alleged herein.

      S.    <u>Unica Realty, Inc. - May 16, 2006</u>

111.    On or around May 16, 2006, Defendants Irizarry, Abrahamson, Lynn, and Nin approved, as members of the Joint Loan Committee, a $4,450,000 loan to Unica Realty, Inc.  On or around June 28, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $536,000 increase in this loan for a new total of $4,986,000.

112.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

       a.   The loan-to-value ratio for this loan was 86%, in violation of the Bank's policy maximum; and

       b.   With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities exceeded $6 million; and

       c.   This loan was intended to fund the acquisition and development of land while the local real estate market was already in decline.

113.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $4.32 million.  Such loss was proximately caused by the conduct alleged herein.

T.    Unica Realty, Inc. - May 16, 2006

114.    On or around May 16, 2006, Defendants Irizarry, Abrahamson, Lynn, and Nin approved, as members of the Joint Loan Committee, a $830,000 loan to Unica Realty, Inc.  On or around June 28, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $120,000 increase in this loan for a new total of $950,000.

115.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

    a.  The loan-to-value ratio was inappropriately calculated based on hypothetical prospective value; and

    b.  The loan-to-value ratio was inappropriately calculated because it failed to take into account the already existing first mortgage on the collateral property; and

    c.  With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities exceeded $6 million.

116.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $809,000.  Such loss was proximately caused by the conduct alleged herein.

U.    Juazal, S.E. - May 23, 2006

117.    On or around May 23, 2006, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $5,870,000 loan to Juazal, S.E.

118.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.   The Bank did not analyze the capacity of the borrower or guarantors to service the debt without sale of the collateral property; and

b.   The Bank did not analyze the contingent liabilities of the borrower or guarantor; and

c.   The loan-to-value ratio for this loan was 81%, in violation of the Bank's policy maximum; and

d.   With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities exceeded $52 million.

119.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $4.46 million.  Such loss was proximately caused by the conduct alleged herein.

V.    Pearl Development, Inc. - May 23, 2006

120.    On or around May 23, 2006, Defendants Irizarry, Abrahamson, Lynn, Berrios, and Nin approved, as members of the Joint Loan Committee, a $11,900,000 loan to the Builders Group Development Company.  On June 27, 2006, the borrower name for this loan was changed to Pearl Development, Inc.

121.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.   The loan-to-value ratio and loan-to-cost ratio for this loan were 94% and 100% respectively, both of which exceeded the Bank's policy maximum; and

b.   The borrower's equity in this project was 2%, in violation of the Bank's policy minimum of 15%; and

c.   The Bank failed to obtain its own appraisal of the collateral property.

122.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $10.43 million.  Such loss was proximately caused by the conduct alleged herein.

W.    Alturas Del Bosque, S.E. - June 6, 2006

123.    On or around June 6, 2006, Defendants Irizarry, Abrahamson, Lynn, Berrios, and Nin approved, as members of the Joint Loan Committee, a $8,433,467 loan to Alturas Del Bosque, S.E.  On or around November 21, 2006, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga and Gorbea approved, as members of the Directors' Loan Committee, an increase of $1,000,000 in this loan for a new total of $9,433,467.

124.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.   The financial statements of the borrower showed negative net worth; and

b.   The Bank failed to analyze the capacity of the borrower or guarantors to service the debt without sale of the collateral property; and

c.   The loan-to-cost ratio for this loan was 86%, in violation of the Bank's policy maximum.

125.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $6.63 million.  Such loss was proximately caused by the conduct alleged herein.

X.    Alturas Del Bosque, S.E. - June 6, 2006

126.    On or around June 6, 2006, Defendants Irizarry, Abrahamson, Lynn, Berrios, and Nin approved, as members of the Joint Loan Committee, a $11,566,533 loan to Alturas Del Bosque, S.E.

127.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

        a.   The financial statements of the borrower showed negative net worth; and

        b.   The Bank failed to analyze the capacity of the borrower or guarantors to service the debt without sale of the collateral property; and

        c.   The loan-to-value ratio for this loan was 76%, in violation of the Bank's policy maximum.

128.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $10.01 million.  Such loss was proximately caused by the conduct alleged herein.

Y.    **Antonio Bastard Rodriguez - June 27, 2006**

129.    On or around June 27, 2006, Defendants Irizarry, Abrahamson, Lynn, and Nin approved, as members of the Directors' Loan Committee, a $15,600,000 loan to Empresas Bastard, Inc.  When this loan was funded, it was split into two different loans, one of which was a $4,812,196 loan in the name of Antonio Bastard Rodriguez.

130.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

        a.   The borrower's credit score was 477, far below the Bank's policy minimum of 600; and

        b.   The Bank had denied, only a month before, a $500,000 loan to the same borrower because of concerns about his ability to repay; and

        c.   The primary repayment source for this loan was to be the sale of the collateral property, but all offers to purchase the property were conditioned on government approval of a zoning change that had not been obtained.

131.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $4.22 million.  Such loss was proximately caused by the conduct alleged herein.

        Z.    <u>Empresas Bastard, Inc. - June 27, 2006</u>

132.    On or around June 27, 2006, Defendants Irizarry, Abrahamson, Lynn, and Nin approved, as members of the Directors' Loan Committee, a $15,600,000 loan to Empresas Bastard, Inc.  When this loan was funded, it was split into two different loans, one of which was a $10,787,804 loan in the name of Empresas Bastard, Inc.

133.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

        a.   The guarantor's credit score was 477, far below the Bank's policy minimum of 600; and

        b.   The Bank had denied, only a month before, a $500,000 loan to the guarantor because of concerns about his ability to repay; and

        c.   The primary repayment source for this loan was to be the sale of the collateral property, but all offers to purchase the property were conditioned on government approval of a zoning change that had not been obtained.

134.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $9.3 million.  Such loss was proximately caused by the conduct alleged herein.

AA.   <u>Joel Katz - June 27, 2006</u>

135.   On or around June 27, 2006, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $9,250,000 loan to Joel Katz.  On or around August 7, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $700,000 increase in this loan for a new total of $9,950,000.

136.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

        a.   The Bank failed to adequately analyze the financial statements of the borrower for, *inter alia*, cash flow or liquidity ratios; and

        b.   This loan was intended in part to consolidate previous loans from the Bank to the borrower that had not had any principal reduction for over two years; and

        c.   The loan-to-value ratio for this loan was 85%, in violation of the Bank's policy maximum.

137.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $8.34 million.  Such loss was proximately caused by the conduct alleged herein.

BB.   <u>Plaza Esmeralda Management Group Corporation - August 1, 2006</u>

138.   On or around August 1, 2006, Defendants Irizarry and Abrahamson approved, as officers, a $4,471,000 loan to Plaza Esmeralda Management Group Corporation.

139.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.   The guarantors' credit scores were 581 and 533, in violation of the Bank's policy minimum of 600; and

b.   The Bank relied on an appraisal from an appraiser not on the Bank's approved list; and

c.   The borrower failed to meet a condition precedent requiring it to obtain an amended lease agreement from the tenant on the collateral property.

140.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $3.82 million.  Such loss was proximately caused by the conduct alleged herein.

CC.   <u>Plaza Esmeralda Management Group Corporation - August 1, 2006</u>

141.   On or around August 1, 2006, Defendants Irizarry and Abrahamson approved, as officers, a $483,000 loan to Plaza Esmeralda Management Group Corporation.

142.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.   The guarantors' credit scores were 581 and 533, in violation of the Bank's policy minimum of 600; and

b.   The Bank relied on an appraisal from an appraiser not on the Bank's approved list; and

c.   The borrower failed to meet a condition precedent requiring it to obtain an amended lease agreement from the tenant on the collateral property.

143.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $417,000.  Such loss was proximately caused by the conduct alleged herein.

DD.   Kings Court Residences, Inc. - August 22, 2006

144.   On or around August 22, 2006, Defendants Irizarry and Abrahamson approved, as members of the Management Loan Committee, a $5,100,000 loan to Kings Court Residences, Inc.

145.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

      a.   The borrower failed to satisfy a condition precedent that required it to increase its depository relationship with the Bank; and

      b.   The borrower had not injected any of its own equity into the project before the loan was funded; and

      c.   The borrower's ability to repay the loan was dependent on later obtaining a construction loan, but it was not certain that such a loan could later be obtained; and

      d.   The Bank failed to conduct a market feasibility analysis of the construction project.

146.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $4.32 million.  Such loss was proximately caused by the conduct alleged herein.

EE.   Kings Court Residences, Inc. - August 22, 2006

147.   On or around August 22, 2006, Defendants Irizarry and Abrahamson approved, as members of the Management Loan Committee, a $436,000 loan to Kings Court Residences, Inc.

148.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.  The borrower failed to satisfy a condition precedent that required it to increase its depository relationship with the Bank; and

b.  The borrower had not injected any of its own equity into the project before the loan was funded; and

c.  The borrower's ability to repay the loan was dependent on later obtaining a construction loan, but it was not certain that such a loan could later be obtained; and

d.  The Bank failed to conduct a market feasibility analysis of the construction project.

149.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $369,000.  Such loss was proximately caused by the conduct alleged herein.

FF.   Ernesto Acosta Matos - August 29, 2006

150.   On or around August 29, 2006, Defendants Irizarry and Abrahamson approved, as members of the Management Loan Committee, a $12,500,000 loan to Ernesto Acosta Matos.

151.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.  The primary repayment source for this loan was to be the sale of mortgage notes on the secondary market, but the Bank knew that the borrower had already experienced difficulty making such sales; and

b.  The borrower had failed to timely repay advances on another loan; and

c.  With the approval of this loan, the Bank's aggregate exposure to the borrower and related entities exceeded $24 million.

152.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $301,000.  Such loss was proximately caused by the conduct alleged herein.

GG.    Boquerón Resort, S.E. - September 5, 2006

153.    On or around September 5, 2006, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $11,000,000 loan to Boquerón Resort, S.E.

154.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

   a.   The borrower failed to meet a condition precedent requiring a Phase I Environmental Study of the collateral property; and

   b.   With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $85 million.

155.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $6.97 million.  Such loss was proximately caused by the conduct alleged herein.

HH.    Carlos Estrada Colón - November 3, 2006

156.    On or around November 3, 2006, Defendant Irizarry approved, as an officer, a $382,900 loan to Carlos Estrada Colón.

157.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

      a.   The Bank relied on an appraisal that was nearly six years old by time of approval, despite the fact that the real estate market was in serious decline; and

      b.   The collateral for this property was inaccurately described in the Offering Ticket as the borrower's principal residence, when it was in fact property owned by the borrower's father's business.

158.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $413,000.  Such loss was proximately caused by the conduct alleged herein.

II.     <u>EER-Isuzu de Puerto Rico, Inc. - November 20, 2006</u>

159.   On or around November 20, 2006, Defendants Irizarry and Abrahamson approved, as officers, a $4,970,000 loan to EER-Isuzu de Puerto Rico, Inc.

160.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

      a.   The loan was secured by a leasehold interest in the collateral property, but the Offering Ticket analyzed the collateral's value as if it was a fee simple interest; and

      b.   The Bank's collateral leasehold interest was defective because the owner of the property, the government of Puerto Rico, had to consent before that leasehold interest could be transferred.

161.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $5.15 million.  Such loss was proximately caused by the conduct alleged herein.

JJ.   <u>Mejia Construction Corporation - November 21, 2006</u>

162.   On or around November 21, 2006, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $800,000 loan to Mejia Construction Corporation.  On or around November 28, 2006, Defendants Irizarry and Abrahamson approved, as officers, a $77,000 increase in this loan for a new total of $877,000.

163.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

     a.   The Bank relied on an appraisal over two years old, despite the fact that the real estate market had entered serious decline; and

     b.   The loan-to-cost ratio on this loan was 125%, in violation of the Bank's policy maximum; and

     c.   With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities was over $40 million.

164.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $624,000.  Such loss was proximately caused by the conduct alleged herein.

KK.   <u>R.J. Development, S.E. - November 21, 2006</u>

165.   On or around November 21, 2006, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $480,000 loan to R.J. Development, S.E.

166.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

    a.   The Bank failed to stress test the borrower's ability to repay in the event of adverse market changes, despite the fact that the real estate market was already in serious decline; and

    b.   The Bank failed to conduct a market feasibility study of the development project to be financed by the loan; and

    c.   With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $40 million.

167.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $341,000.  Such loss was proximately caused by the conduct alleged herein.

LL.    <u>R.J. Development, S.E. - November 21, 2006</u>

168.   On or around November 21, 2006, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $298,000 loan to R.J. Development, S.E.

169.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

    a.   The Bank failed to stress test the borrower's ability to repay in the event of adverse market changes, despite the fact that the real estate market was already in serious decline; and

    b.   The Bank failed to conduct a market feasibility study of the development project to be financed by the loan; and

    c.   With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $40 million.

170.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $212,000.  Such loss was proximately caused by the conduct alleged herein.

MM.    Porfirio Guzman - January 3, 2007

171.    On or around January 3, 2007, Defendants Irizarry and Abrahamson, as members of the Management Loan Committee, approved a $1,100,000 loan to Porfirio Guzman.

172.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

      a.    The Bank failed to obtain current financial statements for the borrower; and

      b.    The Bank failed to obtain a credit report for the borrower; and

      c.    The borrower failed to comply with a condition precedent requiring he provide additional collateral security by January 12, 2007.

173.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $942,000.  Such loss was proximately caused by the conduct alleged herein.

NN.    Hector Estrada Colón - January 23, 2007

174.    On or around January 23, 2007, Defendant Irizarry approved, as an officer, a $1,050,000 loan to Hector Estrada Colón.

175.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

      a.    The loan was secured by a leasehold interest in the collateral property, in violation of the Bank's policy; and

b. The loan was funded despite not having received approval from the Directors' Loan Committee, as required by the Bank's policy; and

c. The Offering Ticket inaccurately treated the loan as it was not related to any other loan made by the Bank, when it was in fact related to another loan.

176. The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $1.11 million. Such loss was proximately caused by the conduct alleged herein.

OO. Trilito, Inc. - January 30, 2007

177. On or around January 30, 2007, Defendants Irizarry, Abrahamson, Nin and Gorbea approved, as members of the Directors' Loan Committee, a $21,601,000 loan to Trilito, Inc. On or around February 13, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga and Gorbea approved, as members of the Directors' Loan Committee, a $2,399,000 increase in this loan for a new total of $24,000,000.

178. This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a. The guarantors had credit scores of 598 and 588, below the Bank's policy minimum of 600; and

b. The Bank failed to obtain a complete appraisal of the collateral property before approving this loan; and

c. The loan-to-cost ratio for this loan was 92%, in violation of the Bank's policy maximum; and

d. With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $75 million.

179.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $18.96 million.  Such loss was proximately caused by the conduct alleged herein.

PP.    <u>Juan Zalduondo Viera - March 30, 2007</u>

180.    On or around March 30, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $600,000 to Juan Zalduondo Viera.

181.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.    The Bank failed to stress test the borrower's capacity to repay the debt in the event of a market downturn;

b.    The Bank failed to analyze contingent liabilities for the borrower; and

c.    With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $79 million.

182.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $516,000.  Such loss was proximately caused by the conduct alleged herein.

QQ.    <u>Juan Almeida Leon - April 5, 2007</u>

183.    On or around April 5, 2007, Defendants Irizarry and Abrahamson approved, as officers, a $2,100,000 loan to Juan Almeida Leon.

184.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a. The Bank failed to conduct a title search on the collateral mortgage notes securing this loan; and

b. The collateral mortgage notes were not subscribed by the borrower, but by Emerito Estrada Rivera, who already had a substantial credit relationship with the Bank; and

c. The Bank relied on an appraisal nearly three years old that was not ordered by the Bank.

185. The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $2.13 million. Such loss was proximately caused by the conduct alleged herein.

RR. CT Development Corporation - April 10, 2007

186. On or around April 10, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $17,500,000 loan to CT Development Corporation.

187. This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a. The loan-to-cost ratio for this loan was 89%, in violation of the Bank's policy maximum; and

b. The Bank did not satisfy a condition precedent requiring it to obtain an opinion from the Puerto Rico Office of the Commissioner of Financial Institutions as to the Bank's legal lending limit; and

c. With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $128 million.

188.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $14.1 million.  Such loss was proximately caused by the conduct alleged herein.

SS.    Dorado Condominium, S.E. - April 10, 2007

189.    On or around April 10, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $1,150,000 loan to Dorado Condominium, S.E.

190.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.    The Bank relied on an appraisal that was nearly four years old; and

b.    One of the guarantors had a credit score of 576, below the Bank's policy minimum of 600; and

c.    The loan-to-cost ratio for this loan was 100%, in violation of the Bank's policy maximum.

191.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $894,000.  Such loss was proximately caused by the conduct alleged herein.

TT.    Multiplaza de Puerto Rico, Inc. - May 3, 2007

192.    On or around May 3, 2007, Defendant Irizarry approved, as an officer, a $1,300,000 loan to Multiplaza de Puerto Rico, Inc.  On or around January 29, 2008, Nin, Rivera-Arreaga, and Gorbea ratified, as members of the Directors' Loan Committee, that loan effective May 15, 2007.

193.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

    a.   The loan-to-value ratio for this loan was 85%, in violation of the Bank's policy maximum; and

    b.   The guarantors had credit scores of 588 and 598, below the Bank's policy minimum of 600; and

    c.   With approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $76 million.

194.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $1.22 million.  Such loss was proximately caused by the conduct alleged herein.

    UU.   Porfirio Guzman - May 30, 2007

195.    On or around May 30, 2007, Defendants Irizarry and Abrahamson approved, as officers, a $500,000 loan to Porfirio Guzman.

196.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

    a.   The Bank did not obtain current financial statements for the borrower; and

    b.   The Bank did not obtain a credit report on the borrower; and

    c.   With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $19 million.

197.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $425,000.  Such loss was proximately caused by the conduct alleged herein.

VV.   Dorado Condominium, S.E. - June 28, 2007

198.   On or around June 28, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $425,000 loan to Dorado Condominium, S.E.

199.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.   The Bank relied on an appraisal over four years old; and

b.   One of the guarantors had a credit score of 576, below the Bank's policy minimum of 600; and

c.   The loan-to-cost ratio and loan-to-value ratio for this loan were 100% and 95% respectively, both of which violated the Bank's policy maximum; and

d.   With this approval, the Bank's aggregate exposure to this borrower and related entities exceeded $79 million.

200.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $317,000.  Such loss was proximately caused by the conduct alleged herein.

WW.   Empresas Cerromonte Corporation - October 4, 2007

201.   On or around October 4, 2007, Defendants Irizarry and Abrahamson approved, as members of the Management Loan Committee, a $8,727,000 loan to Empresas Cerromonte Corporation.

202.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

    a.  The guarantor's credit score was 554, below the Bank's policy minimum of 600; and

    b.  The borrower's financial statements demonstrated that he had no ability to make the required $500,000 cash down payment; and

    c.  The Bank extended the loan assuming that the collateral property would be appraised at a minimum value of $14,000,000, but did not modify the loan when it received the actual appraisal that concluded a value of $10,640,000.

203.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $7.88 million.  Such loss was proximately caused by the conduct alleged herein.

XX.    Emerito Estrada Rivera - October 29, 2007

204.    On or around October 29, 2007, Defendants Irizarry and Abrahamson approved, as officers, a $700,000 loan to Emerito Estrada Rivera.

205.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

    a.  The borrower's credit score was 569, below the Bank's policy minimum of 600; and

    b.  The Offering Ticket omitted at least two related loans from the aggregate indebtedness analysis.

206.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $754,000.  Such loss was proximately caused by the conduct alleged herein.

YY.   Por Mag Real Estate, S.E. - November 13, 2007

207.   On or around November 13, 2007, Defendants Irizarry and Abrahamson approved, as members of the Management Loan Committee, a $7,000,000 increase to an existing line of credit to Por Mag Real Estate, S.E.  On November 28, 2007, the increase was split into a separate loan of $7,000,000.

208.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

      a.   The guarantor's credit score was 576, below the Bank's policy minimum of 600; and

      b.   The Bank relied on appraisals that were not addressed to the Bank; and

      c.   With this approval, the Bank's aggregate exposure to this borrower and related entities exceeded $16 million.

209.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $5.86 million.  Such loss was proximately caused by the conduct alleged herein.

ZZ.   Dorado Condominium, S.E. - November 27, 2007

210.   On or around November 27, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $425,000 loan to Dorado Condominium, S.E.

211.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

      a.   The Bank relied on an appraisal over four years old; and

      b.   One of the guarantors had a credit score of 576, below the Bank's policy minimum of 600; and

      c.   The loan-to-cost ratio and loan-to-value ratio for this loan were 100% and 95% respectively, both of which violated the Bank's policy maximum; and

      d.   With this approval, the Bank's aggregate exposure to this borrower and related entities exceeded $91 million.

212.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $340,000.  Such loss was proximately caused by the conduct alleged herein.

AAA.  <u>Hector Estrada Colón - December 17, 2007</u>

213.    On or around December 17, 2007, Defendant Irizarry approved, as an officer, a $300,000 loan to Hector Estrada Colón.

214.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

      a.   The Offering Ticket omitted several related loans from the aggregate indebtedness analysis; and

      b.   The loan was completely unsecured.

215.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $323,000.  Such loss was proximately caused by the conduct alleged herein.

BBB.   Multiplaza de Puerto Rico, Inc. - December 19, 2007

216.   On or around December 19, 2007, Defendants Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea approved, as members of the Directors' Loan Committee, a $300,000 loan to Multiplaza de Puerto Rico, Inc.

217.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.   The guarantors had credit scores of 588 and 598, below the Bank's policy minimum of 600; and

b.   With this approval, the Bank's aggregate exposure to this borrower and related entities exceeded $76 million.

218.   The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $161,000.  Such loss was proximately caused by the conduct alleged herein.

CCC.   Joel Katz - February 26, 2008

219.   On or around February 26, 2008, Defendants Irizarry, Nin, Rivera-Arreaga and Gorbea approved, as members of the Directors' Loan Committee, a $1,300,000 loan to Joel Katz.

220.   This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.   The financial statements submitted by the borrower did not contain income and expense information; and

b.   The loan was totally unsecured; and

c.   With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $58 million.

221.     The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $1.07 million.  Such loss was proximately caused by the conduct alleged herein.

DDD.  EER-Isuzu de Puerto Rico, Inc. - April 15, 2008

222.     On or around April 15, 2008, Defendant Irizarry approved, as an officer, a $145,000 loan to EER-Isuzu de Puerto Rico, Inc.

223.     This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.     The Offering Ticket mischaracterized the loan as real estate secured, when in fact it was only secured by a leasehold interest; and

b.     The Offering Ticket omitted several related loans from the aggregate indebtedness analysis.

224.     The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $156,000.  Such loss was proximately caused by the conduct alleged herein.

EEE.  Jalexis, Inc. - June 24, 2008

225.     On or around June 24, 2008, Defendants Irizarry, Nin, Rivera-Arreaga, Gorbea, and Rodríguez approved, as members of the Directors' Loan Committee, a $7,800,000 loan to Jalexis, Inc.

226.     This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a.     Financial statements submitted for the guarantor did not include income and expense information; and

      b.  The borrower's credit score had steadily deteriorated over the past four years; and

      c.  With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $58 million.

227.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $6.62 million.  Such loss was proximately caused by the conduct alleged herein.

     FFF.   Bayola Apartments Limited Partnership, S.E.

228.    On or around December 24, 2008, Defendants Nin, Gorbea, and Rodríguez approved, as members of the Directors' Loan Committee, a $659,584.95 loan to Bayola Apartments Limited Partnership, S.E.

229.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

      a.  The Bank failed to order an updated appraisal of the collateral property until after the loan had already been funded; and

      b.  With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $65 million.

230.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $541,000.  Such loss was proximately caused by the conduct alleged herein.

GGG.  <u>Carolina Industrial Park, S.E. - December 24, 2008</u>

231.    On or around December 24, 2008, Defendants Nin, Gorbea, and Rodríguez approved, as members of the Directors' Loan Committee, a $176,016.09 loan to Carolina Industrial Park, S.E.

232.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

      a.  The Bank failed to obtain an updated appraisal of the collateral property prior to funding; and

      b.  The Bank inaccurately included a tenant's income that was null in its calculation of the debt-service-coverage ratio for this loan; and

      c.  This loan was intended to provide the borrower with a "cash-out" on a pre-existing loan; and

      d.  With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $74 million.

233.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $136,000.  Such loss was proximately caused by the conduct alleged herein.

HHH.  <u>El Verde Associates, S.E. - December 24, 2008</u>

234.    On or around December 24, 2008, Defendants Nin, Gorbea, and Rodríguez approved, as members of the Directors' Loan Committee, a $193,867.07 loan to El Verde Associates, S.E.

235.    This loan was approved and funded despite numerous underwriting deficiencies, including the fact that:

a. This loan was intended to create an interest reserve for a pre-existing loan from the Bank to the borrower; and

b. The Bank relied on an appraisal that was over five years old; and

c. With the approval of this loan, the Bank's aggregate exposure to this borrower and related entities exceeded $78 million.

236.    The Bank suffered a loss on this loan in an amount to be determined by the jury, but at this time estimated to be approximately $155,000.  Such loss was proximately caused by the conduct alleged herein.

## VII.    The Bank Collapses

237.    By May 2006, the Puerto Rican real estate market, along with the Puerto Rican economy in general, had begun to slide into a steep decline, and by 2009, this decline had fully exposed the consequences of the Bank's reckless lending.  As a result, the Bank suffered colossal losses.  By February 2009, the Bank's adversely classified loans had exploded to $1.166 billion from their December 2007 level of $261 million.  The Bank's nonaccrual loans had similarly increased to $605.6 million in February 2009 from $210.2 million in December 2007.

238.    On December 4, 2009, regulators issued a Problem Bank Memorandum and downgraded R-G Premier's Asset Quality rating to a 5, the lowest possible score.

239.    In January and February 2010, the Bank continued its downward spiral, suffering additional losses in those months of $14.6 million.  By March 2010, the Bank's classified loans had reached $1.8 billion, and composed 34 percent of the Bank's total loan portfolio.

240.    On April 30, 2010, the OCFI closed the Bank and appointed the FDIC-R as receiver.

## VIII.   The Bank's D&O Coverage

241.   The directors and officers of the Bank (collectively, the "Insureds") are insured under Management Liability Insurance Policy No. ELU108674-08 (the "Primary Policy") and Policy No. ELU108668-08 (the "Excess Policy" and, together with the Primary Policy, the "Policies"), which were both issued by XL.  Both Policies had a policy period of November 30, 2008 to December 30, 2009, and an optional extension period until December 30, 2010.  The optional extension period was exercised on December 29, 2009.  The Primary Policy had an aggregate limit of $25 million, and the Excess Policy had an aggregate limit of $10 million.

242.   Both Policies included Insuring Agreements providing that "[XL] will pay on behalf of the Insured Persons Loss resulting from a Claim first made against the Insured Persons during the Policy Period or, if applicable, the Optional Extension Period, for a Wrongful Act."

243.   The Primary Policy also included an Insuring Agreement providing that XL "will pay on behalf of the Company Loss which the Company is required or permitted to pay as indemnification to any of the Insured Persons resulting from a Claim first made against the Insured Persons during the Policy Period or, if applicable, the Optional Extension Period, for a Wrongful Act."

244.   Both Policies defined "Claim" to include "a written demand for monetary or non-monetary relief."

245.   Both Policies defined "Insured Persons" to include both (1) "any past, present or future director or officer, or member of the Board of Managers, of the Company"; and (2) "the lawful spouse of any [Insured Person] . . . to the extent the spouse is a party to any Claim solely in their capacities as a spouse of such persons, and only for the purposes of any Claim seeking

damages recoverable from marital community property, property jointly held by any such person and spouse, or property transferred from any such person to the spouse."

246.    Both Policies defined "Wrongful Act" to include "any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by any Insured Person while acting in his or her capacity as an . . . Insured Person of the Company or a person serving in a functionally equivalent role for the Parent Company or any Subsidiary."

247.    By letter dated December 23, 2010, the FDIC sent a Demand for Payment of Civil Damages (the "Demand") to the Directors and Officers.  A copy of the Demand was also provided to XL.

## CLAIMS FOR RELIEF

### Count I - Grossly Negligent Failure to Adequately Supervise the Bank's Lending
### (Against All Director Defendants Except Berrios, Lynn, and Prats)

248.    The FDIC-R incorporates by reference each of the allegations in paragraphs 1 through 247 of this complaint.

249.    Each of the Director Defendants named in this count, as directors of the Bank, owed the Bank the obligation to exercise the degree of diligence, care, and skill which ordinarily prudent persons in like positions would exercise under similar circumstances in the management, supervision and conduct of the Bank's business and financial affairs.

250.    By their actions and inactions, as described specifically and generally herein, each of the Defendants named in this count failed and neglected to perform their respective duties as directors of the Bank, constituting breaches of their statutory and common law duties of care owed to the Bank.

251.    By way of example, and not of limitation, the Defendants named in this count instituted and/or preserved an obviously risky lending structure characterized by the dangerous

concentration of lending authority in one man and a lack of internal controls to monitor loans extended under that structure.

252.    By at least February 22, 2006, when the Defendants were notified that regulators had rated the Bank's management as a 3, the Defendants named in this count were aware that their oversight of the Bank was deficient.   Therefore, by at least February 22, 2006, the Defendants named in this count were grossly negligent in failing to correct the Bank's dangerous lending structure and also failing to institute effective internal controls to ensure that loans made by the Bank complied with principles of prudent risk management.

253.    As a direct and proximate result of the grossly negligent acts and omissions of each Defendant named in this count, the Bank suffered damage and sustained losses in an amount to be proved at trial, which, upon information and belief, exceeds $160 million.

254.    XL is liable under the Policies for all damages caused to the Bank by the above named Defendants' grossly negligent failure to adequately supervise the Bank's lending.

### Count II - Grossly Negligent Direct Approval of Obviously Risky Loans
### (Against All of the Directors and Officers Except Agosto)

255.    The FDIC-R incorporates by reference each of the allegations in paragraphs 1 through 247 of this complaint.

256.    Each of the Directors and Officers named in this count, as directors and/or officers of the Bank, owed the Bank the obligation to exercise the degree of diligence, care, and skill which ordinarily prudent persons in like positions would exercise under similar circumstances in the management, supervision and conduct of the Bank's business and financial affairs.

257.    In particular, the Directors and Officers named in this count owed the Bank a duty to inform themselves about, and then carefully evaluate, loans presented to them for their individual approvals.

258.    By personally approving loans despite obvious underwriting deficiencies, as described more fully in this complaint, the Directors and Officers named in this count exhibited a lack of care going beyond ordinary negligence and reaching gross negligence.

259.    As a direct and proximate result of the grossly negligent acts and omissions of each Defendant named in this count, the Bank suffered damage and sustained losses in an amount to be proved at trial, which, upon information and belief, exceeds $257 million.

260.    XL is liable under the Policies for all damages caused to the Bank by the above named Defendants' grossly negligent approval of obviously risky loans.

### Count III - Claim for Direct Relief
### (Against XL)

261.    The FDIC-R incorporates by reference each of the allegations in paragraphs 1 through 260 of this complaint.

262.    As described specifically in this complaint, XL issued the Primary and Excess Policy to RGFC, offering $25 million and $10 million in coverage, respectively.  The Policies provide coverage for "Claims" for "Wrongful Acts" against "Insured Persons" under the Policies.

263.    The FDIC-R's claims against the Directors and Officers, Spouses, and Conjugal Partnerships, as described in this complaint, are "Claims" for "Wrongful Acts" against "Insured Persons" within the meaning of the Policies, and therefore fall within the coverage provided to those Defendants under the Policies issued by XL.

264.   XL is liable under the Policies for $35 million in damages caused to the Bank by the gross negligence of the Defendants, as described in this complaint.

## JURY DEMAND

265.   The FDIC-R respectfully demands a trial by jury for all issues in this case that are triable by the jury.

## PRAYER FOR RELIEF

WHEREFORE, the FDIC-R respectfully prays for relief as follows:

1.   For compensatory and consequential damages, jointly and severally, against the Directors and Officers, Spouses, and Conjugal Partnerships, as follows (together with prejudgment interest):

    a.   Judgment for at least $160 million against Galán, Rodríguez, Agosto, Carus, Colón-Carlo, Fernandez, Figueroa, Galán Jr., Gorbea, McCormack, Mendez, Nin, Rivera-Arreaga, and Umpierre, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in failing to supervise the Bank's lending;

    b.   Judgment for at least $257 million against Irizarry, Abrahamson, Lynn, Berrios, Nin, Galán, Prats, Rivera-Arreaga, Gorbea, Colón-Carlo, Mendez, Figueroa, Fernandez, Umpierre, Rodríguez, Galán Jr., Carus, and McCormack, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the approvals of loans as detailed below:

        i.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, Nin, Galán, and Prats,

and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the November 23, 2004 approval of the loan to Maxim Tower Corporation;

ii.       Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, and Nin, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the December 16, 2004 approval of the increase in the loan to Maxim Tower Corporation;

iii.      Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the November 21, 2006 approval of the increase in the loan to Maxim Tower Corporation;

iv.      Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, Nin, Galán, and Prats, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the December 14, 2004 approval of the loan to Por Mag Real Estate, S.E.;

v.      Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Berrios, Nin, and Galán, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the December 29, 2004 approval of the loan to Boquerón Resort, S.E.;

vi.     Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the August 31, 2006 approval of the increase in the loan to Boquerón Resort, S.E.;

vii.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, and Nin, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the March 15, 2005 approval of the loan to Real Anon, Inc.;

viii.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, and Berrios, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the March 22, 2005 approval of the loan to Venetian Investment Group, Inc.;

ix.     Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea,

and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the December 11, 2007 approval of the increase in the loan to Venetian Investment Group, Inc.;

x.      Judgment for an amount to be proven at trial against Nin and Rivera-Arreaga, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the August 18, 2009 approval of the increase in the loan to Venetian Investment Group, Inc.;

xi.     Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, Nin, Prats, Rivera-Arreaga, Gorbea, Colón-Carlo, Mendez, Figueroa, Fernandez, and Galán Jr., and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the March 31, 2005 approval of the loan to Jalexis, Inc.;

xii.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, and Nin, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the December 8, 2005 approval of the increase in the loan to Jalexis, Inc.;

xiii.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea,

and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the March 8, 2007 approval of the increase in the loan to Jalexis, Inc.;

xiv.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the May 15, 2007 approval of the increase in the loan to Jalexis, Inc.;

xv.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the July 10, 2007 approval of the increase in the loan to Jalexis, Inc.;

xvi.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, Nin, Galán, and Prats, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the May 23, 2005 approval of the loan to Dorado Condominium, S.E.;

xvii.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, and Nin, and against

their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the May 31, 2005 approval of the loan to Ernesto Acosta Rodriguez;

xviii.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, and Nin, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the June 14, 2005 approval of the loan to Xuapa II, Inc.

xix.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the September 5, 2006 approval of the increase in the loan to Xuapa II, Inc.;

xx.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, Nin, Galán, Prats, Rivera-Arreaga, Gorbea, Colón-Carlo, Mendez, Fernandez, Umpierre, and Galán Jr., and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the July 28, 2005 approval of the loan to Las Americas 74-75, Inc.;

xxi.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, Nin, Galán, Prats,

Rivera-Arreaga, Gorbea, Colón-Carlo, Mendez, Figueroa, Fernandez, Umpierre, Galán Jr., Carus, and McCormack, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the October 28, 2005 approval of the loan to Por Mag Real Estate, S.E.;

xxii.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Berrios, Nin, Galán, Prats, Rivera-Arreaga, Gorbea, Colón-Carlo, Mendez, Figueroa, Fernandez, Umpierre, Galán Jr., Carus, and McCormack, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the October 28, 2005 approval of the loan to Lotesiete, Inc.;

xxiii.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Nin, Galán, Prats, Rivera-Arreaga, Gorbea, Colón-Carlo, Mendez, Figueroa, Fernandez, Umpierre, Galán Jr., Carus, and McCormack, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the December 1, 2005 approval of the loan to Quantum Development Corporation;

xxiv.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, and Nin, and against their

respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the June 27, 2006 approval of the increase in the loan to Quantum Development Corporation;

xxv.   Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the April 26, 2007 approval of the increase in the loan to Quantum Development Corporation;

xxvi.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, and Nin, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the December 21, 2005 approval of the loan to Inmobiliaria El Capa, Inc.;

xxvii.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, Nin, and Galán, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the January 25, 2006 approval of the loan to Dorado del Mar Golf Condos, S.E.;

xxviii.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea,

and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the June 20, 2006 approval of the increase in the loan to Dorado del Mar Golf Condos, S.E.;

xxix.  Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the July 3, 2007 approval of the increase in the loan to Dorado del Mar Golf Condos, S.E.;

xxx.  Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the February 8, 2006 approval of the loan to Emerald Princess, Inc.;

xxxi.  Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the April 25, 2006 approval of the loan to R.J. Development Corporation;

xxxii.  Judgment for an amount to be proven at trial against Irizarry, Nin, Rivera-Arreaga, and Gorbea, and against their

respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the July 28, 2008 approval of the increase in the loan to R.J. Development Corporation;

xxxiii.   Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the April 27, 2006 approval and August 23, 2006 post-approval of the loan to Vista Señorial, Inc.;

xxxiv.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, and Nin, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the May 16, 2006 approval of the loan to Unica Realty, Inc.;

xxxv.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the June 28, 2007 approval of increases in the loan to Unica Realty, Inc.;

xxxvi.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, and Nin, and against their

respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the May 16, 2006 approval of the loan to Unica Realty, Inc.;

xxxvii.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the June 28, 2007 approval of the increase in the loan to Unica Realty, Inc.;

xxxviii.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the May 23, 2006 approval of the loan to Juazal, S.E.;

xxxix.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, and Nin, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the May 23, 2006 approval of the loan to Pearl Development, Inc.;

xl.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Lynn, Berrios, and Nin, and against their respective Spouses and Conjugal Partnerships, for

their gross negligence in connection with the June 6, 2006
approvals of two loans to Alturas Del Bosque, S.E.;

xli.     Judgment for an amount to be proven at trial against
Irizarry, Abrahamson, Nin, Rivera-Arreaga and Gorbea,
and against their respective Spouses and Conjugal
Partnerships, for their gross negligence in connection with
the November 21, 2006 approval of the increase in one loan
to Alturas Del Bosque, S.E.;

xlii.    Judgment for an amount to be proven at trial against
Irizarry, Abrahamson, Lynn, and Nin, and against their
respective Spouses and Conjugal Partnerships, for their
gross negligence in connection with the June 27, 2006
approval of the loan to Antonio Bastard Rodriguez;

xliii.   Judgment for an amount to be proven at trial against
Irizarry, Abrahasmon, Lynn, and Nin, and against their
respective Spouses and Conjugal Partnerships, for their
gross negligence in connection with the June 27, 2006
approval of the loan to Empresas Bastard, Inc.;

xliv.    Judgment for an amount to be proven at trial against
Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea,
and against their respective Spouses and Conjugal
Partnerships, for their gross negligence in connection with
the June 27, 2006 approval of the loan to Joel Katz;

xlv.     Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the August 7, 2007 approval of the increase in the loan to Joel Katz;

xlvi.    Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the August 1, 2006 approvals of two loans to Plaza Esmeralda Management Group Corporation;

xlvii.   Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the August 22, 2006 approvals of two loans to Kings Court Residences, Inc.;

xlviii.  Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the August 29, 2006 approval of the loan to Ernesto Acosta Matos;

xlix.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the September 5, 2006 approval of the loan to Boquerón Resort, S.E.

l.   Judgment for an amount to be proven at trial against Irizarry, and against his Spouse and Conjugal Partnership, for his gross negligence in connection with the November 3, 2006 approval of the loan to Carlos Estrada Colón;

li.   Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the November 20, 2006 approval of the loan to EER-Isuzu de Puerto Rico, Inc.;

lii.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the November 21, 2006 approval of the loan to Mejia Construction Corporation;

liii.   Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective

Spouses and Conjugal Partnerships, for their gross negligence in connection with the November 28, 2006 approval of the increase in the loan to Mejia Construction Corporation;

liv.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the November 21, 2006 approvals of two loans to R.J. Development, S.E.;

lv.    Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the January 3, 2007 approval of the loan to Porfirio Guzman;

lvi.    Judgment for an amount to be proven at trial against Irizarry, and against his Spouse and Conjugal Partnership, for his gross negligence in connection with the January 23, 2007 approval of the loan to Hector Estrada Colón;

lvii.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their

gross negligence in connection with the January 30, 2007 approval of the loan to Trilito, Inc.;

lviii.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the February 13, 2007 approval of the increase in the loan to Trilito, Inc.;

lix.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the March 30, 2007 approval of the loan to Juan Zalduondo Viera;

lx.    Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the April 5, 2007 approval of the loan to Juan Almeida Leon;

lxi.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with

the April 10, 2007 approval of the loan to CT Development Corporation;

lxii.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the April 10, 2007 approval of the loan to Dorado Condominium, S.E.;

lxiii.    Judgment for an amount to be proven at trial against Irizarry, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the May 3, 2007 approval, and January 29, 2008 ratification, of the loan to Multiplaza de Puerto Rico, Inc.;

lxiv.    Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the May 30, 2007 approval of the loan to Porfirio Guzman;

lxv.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with

the June 28, 2007 approval of the loan to Dorado Condominium, S.E.;

lxvi.   Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the October 4, 2007 approval of the loan to Empresas Cerromonte Corporation;

lxvii.   Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the October 29, 2007 approval of the loan to Emerito Estrada Rivera;

lxviii.   Judgment for an amount to be proven at trial against Irizarry and Abrahamson, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the November 13, 2007 approval of the loan to Por Mag Real Estate, S.E.;

lxix.   Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the November 27, 2007 approval of the loan to Dorado Condominium, S.E.;

lxx.    Judgment for an amount to be proven at trial against Irizarry, and against his Spouse and Conjugal Partnership, for his gross negligence in connection with the December 17, 2007 approval of the loan to Hector Estrada Colón;

lxxi.    Judgment for an amount to be proven at trial against Irizarry, Abrahamson, Nin, Rivera-Arreaga, and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the December 19, 2007 approval of the loan to Multiplaza de Puerto Rico, Inc.;

lxxii.    Judgment for an amount to be proven at trial against Irizarry, Nin, Rivera-Arreaga and Gorbea, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the February 26, 2008 approval of the loan to Joel Katz;

lxxiii.    Judgment for an amount to be proven at trial against Irizarry, and against his Spouse and Conjugal Partnership, for his gross negligence in connection with the April 15, 2008 approval of the loan to EER-Isuzu de Puerto Rico, Inc.;

lxxiv.    Judgment for an amount to be proven at trial against Irizarry, Nin, Rivera-Arreaga, Gorbea, and Rodríguez, and against their respective Spouses and Conjugal Partnerships,

for their gross negligence in connection with the June 24, 2008 approval of the loan to Jalexis, Inc.;

lxxv.   Judgment for an amount to be proven at trial against Nin, Gorbea, and Rodríguez, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the December 24, 2008 approval of the loan to Bayola Apartments Limited Partnership, S.E.;

lxxvi.   Judgment for an amount to be proven at trial against Nin, Gorbea, and Rodríguez, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the December 24, 2008 approval of the loan to Carolina Industrial Park, S.E.;

lxxvii.   Judgment for an amount to be proven at trial against Nin, Gorbea, and Rodríguez, and against their respective Spouses and Conjugal Partnerships, for their gross negligence in connection with the December 24, 2008 approval of the loan to El Verde Associates, S.E.

2.   Judgment for at least $35 million against XL for its liability under the Policies for any judgment that the FDIC-R may obtain in this action on Counts I and II against the Directors and/or the Officers, their Spouses, and Conjugal Partnerships.

3.   All costs incurred for the investigation, filing and litigation against all Defendants.

4.      Reasonable attorneys' fees, plus pre and post judgment prevailing legal interest against all Defendants; and

5.      For such other and further relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 18th day of January, 2012.

s/Jairo Mellado-Villarreal
Jairo Mellado-Villarreal, 208112
Attorney for FDIC-R
MELLADO & MELLADO-VILLARREAL
165 Ponce de León Ave., Suite 102
San Juan, Puerto Rico  00917-1233
Tel. 787-767-2600/Fax 787-767-2645
E-mail jmellado@mellado.com

s/Dennis S. Klein
Dennis S. Klein, Esq., *pro hac vice*[1]
klein@hugheshubbard.com
s/William J. Sanchez
William J. Sanchez, Esq., *pro hac vice*
sanchezw@hugheshubbard.com
Attorneys for FDIC-R
Hughes Hubbard & Reed LLP
201 S Biscayne Blvd.
Suite 2500
Miami, Fl 33131-4305
Tel. 305-358-1666/Fax. 305-371-8759

s/Steven C. Morrison
Steven C. Morrison, Esq., *pro hac vice*
Attorney for FDIC-R
Federal Deposit Insurance Corporation
7777 Baymeadows Way West, Suite 551L
Jacksonville, FL 32256
Tel. 904-256-3854/Fax. 904-256-3854
E-mail stemorrison@fdic.gov

---

[1] On this same date Mr. Klein, Mr. Sanchez and Mr. Morrison have presented their respective *pro hac vice* applications pursuant to L.Civ.R. 83A(f) (D.P.R. 2009). Thus, they are thus pending resolution.